IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CHRISTINA LIANE LESTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 23-CV-94-GLJ |
| ) | |
| MARTIN O'MALLEY,[1] ) | |
| Commissioner of the Social ) | |
| Security Administration ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Claimant Christina Lester requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED AND REMANDED.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that

---

[1] On December 20, 2023, Martin J. O'Malley became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted for Kilolo Kijakazi as the Defendant in this action.

[s]he is not only unable to do his previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether the correct legal standards were applied. *See Hawkins v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799,

---

[2] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairments *is not* medically severe, disability benefits are denied. If she *does* have a medically sever impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work. At step five, the burden shifts to the Commissioner to show that there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

800 (10th Cir. 1991). Instead, the Court must review the record as a whole, and "[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, U.S. 474, 488 (1951). S*ee also Casias*, 933 F.2d at 800-01.

### Claimant's Background and Procedural History

Claimant was fifty-two years old at the time of the administrative hearing. (Tr. 52, 251). She obtained a high school education and has no past relevant work. (Tr. 42). Claimant alleges an onset date of January 1, 2020, due to limitations imposed by emphysema, asthma, PTSD, 3 deep vein thrombosis, hemorrhaging issues, post-thrombotic syndrome, celiac disease, fibromyalgia, and acute kidney injury. (Tr. 270).

### Procedural History

On September 15, 2020, Claimant protectively applied for disabled widow's benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. (Tr. 113, 250-52). On August 4, 2022, ALJ, J. Leland Bentley, conducted an administrative hearing and found she was not disabled in a written decision dated September 13, 2022. (Tr. 23-44, 54). The Appeals Council denied review (Tr. 1-7), making the ALJ's opinion the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. § 404.971.

### Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. (Tr. 42-43). At step two he determined that Claimant had the severe impairments of post-thrombotic syndrome, status post deep vein thromboses, history of anemia, cervical spine degenerative disc disease, asthma, obesity, major depressive disorder, generalized anxiety disorder,

obsessive personality disorder, adjustment disorder with mixed anxiety and depressed mood, and PTSD. (Tr. 256). He found at step three that Claimant did not meet any Listing. (Tr. 26-31). At step four he found Claimant had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b), but that she could only occasionally climb ramps and stairs but not climb ladders or scaffolding, and that she requires a sit/stand option, defined as a brief positional change from sitting to standing and vice versa with no more than one change in position every twenty minutes and without leaving the workstation so as not to diminish pace or production. (Tr. 31). The ALJ also found Claimant must avoid unprotected heights, dangerous moving machinery and even moderate exposure to dust, fumes, odors, and poorly ventilated areas. (Tr. 31). Due to psychologically-based limitations, the ALJ found Claimant could understand, remember, and apply simple, multistep instructions, make simple work-related decisions, concentrate and persist for extended periods in order to complete simple multistep work tasks with routine supervision, and interact with and respond appropriately to others in a routine work setting, but she would need to avoid work-related interaction with the general work public. (Tr. 31). Lastly, the ALJ found Claimant could adapt to a work setting where changes are infrequent, well-explained, and introduced gradually, and she could recognize and avoid normal workplace hazards. (Tr. 31). The ALJ then concluded that although Claimant had no past relevant work, she was nevertheless not disabled because there was work she could perform in the national economy, *i.e.*, office helper, routing clerk, and laundry sorter. (Tr. 42-43).

## Review

Claimant contends that the ALJ erred by failing to: (1) explain what limitations, if any, stem from Claimant's obsessive personality disorder; (2) properly analyze the consistency of the state agency psychologist's medical opinions; (3) provide a narrative explanation for his RFC as required by Soc. Sec. R. 96-8p; and (4) properly evaluate Claimant's subjective statements when analyzing Claimant's mental impairments. The Court agrees with Claimant's first contention, and the ALJ's decision should therefore be remanded.

On November 26, 2019, Claimant visited Evan D. Cole, D.O., presenting with pain in her left leg that radiated to her ankle and reporting a history of deep vein thromboses ("DVT"). (Tr. 754). An ultrasound confirmed thrombosis of the left superficial femoral and common femoral vein. (Tr. 753-754). On February 20, 2020, Claimant was again positive for left lower extremity DVT. (Tr. 488, 543-44). On February 24, 2020, an inferior vena cava ("IVC") filter was inserted to lower Claimant's risk of ascending pulmonary embolus, and the IVC was removed on September 2, 2020. (Tr. 494, 500, 509, 539, 1042-43). By May 8, 2020, Dr. Cole concluded there were no new issues related to Claimant's DVT and, although there was an increased circumference of the left calf compared to the right calf, there was no evidence of cellulitis or acute change, and Claimant did not require any specific restriction to her activity. (Tr. 750).

In November 2020, Claimant visited primary care physician Dr. Jason D. Dansby, M.D., reporting tenderness in her thyroid area. (Tr. 743). A subsequent thyroid ultrasound revealed a sub-centimeter nodule of right mid-thyroid. (Tr. 741). Nine days later, Claimant

reported right side neck pain, but a CT of the neck was unremarkable. (Tr. 736, 740). In June 2021, Claimant visited the hospital for a consultation to evaluate a burning of the left posterior tongue, which Dr. Edgar M. Boyd, M.D. noted she convinced herself was cancer. (Tr. 1098). Upon examination, Dr. Boyd did not identify any signs or symptoms suspicious for malignancy but "because of . . . [her] severe anxiety, [he] felt that a definitive evaluation with a biopsy of the suspicious areas [was] warranted." (Tr. 1098).

As to Claimant's mental impairments, Dr. Dansby's records reflect that Claimant's PTSD and anxiety were stable/controlled but she should continue to engage in therapy. (Tr. 705, 706, 796). Claimant began clinical therapy in July 2017 with Mary C. Ward, LPC, at which point she presented with indicators of chronic prolonged post-traumatic stress disorder ("PTSD"). (Tr. 580, 795). Ms. Ward diagnosed Claimant with "other specified trauma and stressor related disorder" and "adjustment disorder, with mixed anxiety and depressed mood." (Tr. 852-1041). Between July 2017 and January 2021, Ms. Ward consistently reported Claimant's "functional status" as "intact," except during times of significant trauma such as her husband's suicide and the death of her son (Tr. 853-946). From February 2021 through February 2022, Claimant's functional status was largely functional or mildly impaired, (Tr. 947-1040), with occasional bouts of being moderately impaired (Tr. 948, 959, 967), or impaired. (Tr. 948, 959, 967).

Beginning in April 2021, Ms. Ward's psychotherapy progress notes also documented Claimant's motor activity as consistently "agitated" (Tr. 971-76, 978-95, 997-1041) and her memory was generally intact (Tr. 971-1040) with occasional notations indicating she suffered from either poor remote or recent memory. (Tr. 973-1020). Her

attention/concentration was generally marked as "distractable," while her thought process varied between unremarkable, "blocking," and "perseveration." (Tr. 971-1040). Lastly, her thought content was either reported as "preoccupied" or as "obsessions." (Tr. 971-1040). Ms. Ward's notes reflect Claimant frequently experienced obsessions relating to the spousal abuse she experienced, her husband's suicide, her son's death, and her health, primarily as it related to Claimant's concerns about cancer. (Tr. 961-1098). Additionally, Ms. Ward's records indicate Claimant had difficulties regulating her emotions, despite therapeutic exercises such as listening to a relaxation CD and/or conducting breathing exercises. (Tr. 1023). Records further indicate Claimant had a strained relationship with her daughter. (Tr. 997).

In an undated letter, Ms. Ward reported that Claimant was diagnosed with chronic prolonged PTSD, severe anxiety, depression, and obsessive personality disorder. (Tr. 790). Ms. Ward noted that Claimant presented with severe anxiety, panic attacks, nightmares, and flashbacks that occurred on a daily basis, caused by the emotional, psychological, and physical abuse she experienced. (Tr. 791). Ms. Ward further indicated that, despite showing improvements with decreased fear, "victimhood" obsessions, and increased confidence, her symptoms were severe, and that Claimant suffered long-term damage that "most likely won't be completely reparable." (Tr. 795).

Claimant presented for a psychological consultative examination on February 23, 2021. (Tr. 719-21). Claimant's affect was constricted, mood anxious, attention/concentration adequate, thought content appropriate, and her interview behavior ranged from irritable/defensive at times to very cooperative at other times. (Tr. 720).

Licensed Professional Counselor Kim Beair assessed Claimant with major depressive disorder, recurrent; generalized anxiety disorder, and PTSD. (Tr. 721). A physical consultative examination was conducted on March 3, 2021. Nurse Practitioner Anita Williams's "summary of abnormal findings" states that Claimant ambulated with an even, steady gait without the use of an assistive device, despite her heel, toe, and tandem walking being slightly impaired, and further notes that Claimant had pain in the neck and a slightly limited range of motion with flexion. (Tr. 726).

State agency physicians determined initially and upon reconsideration that Claimant could perform light work with the environmental limitation that Claimant must avoid "even moderate exposure" to fumes, odors, dusts, gases, poor ventilation. (Tr. 92-93, 122-23). State agency psychological consultant, William H. Farrell, Ph.D., concluded Claimant could understand, recall, and perform simple and detailed tasks and make related judgments, concentrate for two hour periods with routine breaks, pace and persist for an eight-hour work day and forty-hour work week despite her psychological symptoms, interact with coworkers and supervisor on a superficial basis, tolerate working in the presence of the public when frequent conversation or communication is not needed, and is able to adapt to her work setting and some changes in the work setting. (Tr. 100). On reconsideration, Brian Snider, Ph.D. made findings similar to Dr. Farrell, except that he concluded Claimant could not interact appropriately or tolerate contact with the public and that, although Claimant can relate to supervisors and peers on a superficial work basis, she would work best in a setting with infrequent contact and longer periods of solitary work. (Tr. 130).

At the administrative hearing, Claimant testified that her primary impairments consist of PTSD, post-thrombotic syndrome of the left leg, COPD, asthma, degenerative disc disease, fibromyalgia, and autoimmune issues. (Tr. 55). As to her DVT, she testified her left leg experiences pain, discoloration, and swelling, and that she can only walk fifteen to twenty feet before she has to sit down. (Tr. 55-56). However, she noted she has not had any issues with her DVT since December of 2020 except for "a little bit of kidney damage" and a heart issue. (Tr. 69). She further indicated that she could engage in some house activities such as cooking (so long as she has a stool nearby to rest at), but generally her son helps with vacuuming, sweeping, dusting, and any kind of reaching or bending. (Tr. 59). Regarding her mental impairments, Claimant testified that because of severe traumatic physical and emotional abuse she experiences flashbacks, intrusive thoughts that occur at least fifteen times a day, and nightmares that occur multiple times throughout the night. (Tr. 59-51). As a result of the flashbacks, she indicated she experiences panic attacks that often interrupt her day, and that she has not been driving because she has flashbacks. (Tr. 59-61, 67). She testified that her anxiety has continued to get worse, but her primary care physician did not believe there was anything that he could do to help. (Tr. 67).

The ALJ then elicited testimony from a vocational expert ("VE") to determine what jobs a Claimant could perform given the RFC described above. (Tr. 70-73). The VE testified that such a Claimant could perform the representative jobs of office helper (DICOT §239.567-010), routing clerk (DICOT §222.687-022), and laundry sorter (DICOT § 361.687-014). (Tr. 71-72). The ALJ then offered a modified hypothetical in which, in addition to normal work breaks, the individual would require three additional unscheduled

breaks in a typical workday that last up to fifteen minutes in duration. The VE testified that such a person would not be able to perform the previous jobs she described. (Tr. 72).

In his written opinion at step four, the ALJ extensively discussed Claimant's hearing testimony and the medical evidence of record. (Tr. 39-40). He then found that Claimant's statements about the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with treatment records. (Tr. 33). The ALJ found the opinions of the state agency medical consultants to be largely, but not entirely, persuasive and found further limitations as a result of Claimant's post-thrombotic syndrome, history of anemia, obesity, complaints of knee pain and slightly impaired heel, toe, and tandem walking. (Tr. 41-42). Conversely, he found the opinions of the state agency psychological consultants to be only somewhat persuasive and therefore included less-restrictive RFC limitations because the psychologists did not have access "to the isolated abnormal memory, attention, and concentration mental status examination findings in Ms. Ward's records," the psychologists did not "clearly explain how the evidence they discussed lead to the limitations they opined," and the limitations opined were only somewhat supported by the evidence. (Tr. 41).

Claimant contends the ALJ failed to account for her severe impairment of obsessive personality disorder and further failed to comply with Soc. Sec. R. 96-8p by failing to provide a narrative description explaining how Claimant can: (i) interact with co-workers and supervisors without any restrictions despite her constricted affect, frustration, anger, lability, irritableness, tension, emotional dysregulation, mental impairments, and visible psychomotor agitation; (ii) engage in multi-step work despite her compromised attention,

concentration and memory; and (iii) engage in light work and stand/walk for six hours despite her post-thrombotic syndrome. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Soc Sec. R. 96-8p, 1996 WL 374184, at *7 (July 2, 1996). "When the ALJ has failed to comply with SSR 96-8p because he has not linked his RFC determination with specific evidence in the record, the court cannot adequately assess whether relevant evidence supports the ALJ's RFC determination." *Jagodzinski v. Colvin*, 2013 WL 4849101, at *2 (D. Kan. Sept. 11, 2013) (citing *Brown v. Comm'r of the Soc. Sec. Admin.*, 245 F. Supp. 2d 1175, 1187 (D. Kan. 2003).

<u>Claimant's Obsessive Personality Disorder</u>.  Although the ALJ did include limitations related to Claimant's mental impairments in the RFC, the ALJ has connected no evidence in the record to instruct this court as to how such limitations account for each of the claimant's severe impairments, *i.e.*, particularly her obsessive personality disorder. *See Timmons v. Barnhart*, 118 Fed. Appx. 349, 353 (10th Cir. 2004) (finding the ALJ should have "explained how a 'severe' impairment at step two became 'insignificant' at step five."); *Hamby v. Astrue*, 260 Fed. Appx. 108, 112 (10th Cir. 2008) ("In deciding Ms. Hamby's case, the ALJ concluded that she had many severe impairments at step two. He failed to consider the consequences of these impairments, however, in determining that Ms. Hamby had the RFC to perform a wide range of sedentary work.") Indeed, the ALJ provided only a cursory acknowledgment of Claimant's obsessive thought content by briefly indicating that "Ms. Ward wrote that there were indicators of ongoing obsessive

thinking" and by noting in a footnote that he is aware Ms. Ward's records reflect Claimant exhibited obsessional thought content. (Tr. 39). He then focuses on Claimant's records that indicated her functional status to be intact and fails to discuss the significant probative evidence relating to Claimant's obsessive personality disorder such as Ms. Ward's records that document Claimant's obsessions with her health and victimization (Tr. 961, 963, 965, 972, 974, 980, 982, 989, 999, 1001, 1005, 1041, 1098). *See Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (noting that the ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.) (citations omitted). This was error. Instead, the ALJ should have explained why Claimant's severe impairment, supported by Claimant's therapy notes and medical records, did not call for corresponding limitations in the RFC. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence that he rejects.") (citing *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

 <u>Narrative Discussion</u>.  As to the remaining portion of this argument, however, the ALJ sufficiently explained his RFC assessment. The ALJ briefly mentioned Claimant's abnormal mental status examination findings in addition to her anxiety and panic attacks but ultimately concluded that Claimant could interact and respond appropriately to others in a routine work environment because Claimant indicated she could interact with family and friends, rarely exhibited deficits in interacting with others, and was noted to be interpersonally interactive, pleasant, and cooperative throughout the record. (Tr. 29, 41).

Regarding Claimant's ability to perform multi-step work, the ALJ acknowledged Claimant's memory issues and her contention that she had difficulties understanding and following instructions, but also noted that her memory was frequently recorded as being intact, she testified that she is training to be a bible teacher, and her functional status was normally intact. (Tr. 28, 39-41). Lastly, as it pertains to Claimant's ability to engage in light work, the ALJ discussed the February 2021 consultative examination where she presented with a left leg limp and the March 2021 consultative examination where she presented with a slightly impaired heel, toe, and tandem walking, and her history of DVT, but noted Claimant's records reflect no issues pertaining to Claimant's DVT after December 2020. (Tr. 33-34). Although the ALJ could have provided a more substantive explanation addressing Claimant's limitations in these domains, the Court can follow the ALJ's reasoning and "'a decision of less-than-ideal clarity' should be upheld [where] 'the agency's path may reasonably be discerned.'" *Richard v. Berryhill*, No. 16-CV-928-HE, 2018 WL 920651, at *2 (W.D. Okla. Feb. 16, 2018) (citing *Davis v. Erdmann*, 607 F.2d 917, 919 n.1 (10th Cir. 1979)). Here, the ALJ's opinion clearly indicates that he adequately considered the medical evidence of record in reaching his conclusions regarding Claimant's RFC. *Hill v. Astrue*, 289 Fed. Appx. 289, 293 (10th Cir. 2008) ("The ALJ provided an extensive discussion of the medical record and the testimony in support of his RFC finding. We do not require an ALJ to point to 'specific, affirmative, medical evidence on the record as to each requirement of an exteriorial work level before [he] can determine RFC within that category.'" (quoting *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004). The gist of Claimant's argument here is that the Court should reweigh the evidence

and determine her RFC differently from the Commissioner, which the Court simply cannot do. *See Casias*, 933 F.2d at 800 ("In evaluating the appeal, we neither reweigh the evidence nor substitute our judgment for that of the agency.").

*Medical Opinions of State Agency Psychologists Dr. Farrell and Dr. Snider*.

Next, Claimant asserts that the ALJ erred in evaluating the medical opinions of Dr. Farrell and Dr. Snider. For claims filed on or after March 27, 2017, medical opinions are evaluated pursuant to 20 C.F.R. §§ 404.1520c and 416.920c. Under these rules, the ALJ does not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)[.]" 20 C.F.R. §§ 404.1520c(a), 416.920c(c). Instead, the ALJ evaluates the persuasiveness of all medical opinions and prior administrative medical findings by considering a list of factors. *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b). The factors are: (i) supportability, (ii) consistency, (iii) relationship with the claimant (including length of treatment relationship, frequency of examinations, purpose and extent of treatment relationship, and examining relationship), (iv) specialization, and (v) other factors that tend to support or contradict a medical opinion or prior administrative finding including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. §§ 404.1520c(c), 416.920c(c). Supportability and consistency are the most important factors in evaluating the persuasiveness of a medical opinion and the ALJ must explain how both factors were considered, although the ALJ is generally not required to explain how the other factors were considered. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). However, when the ALJ finds that two or more

medical opinions or prior administrative findings on the same issue are equally well-supported and consistent with the record but are not exactly the same, the ALJ must explain how "the other most persuasive factors in paragraphs (c)(3) and (c)(5)" were considered. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(3). The supportability factor examines how well a medical source supported their own opinion with "objective medical evidence" and supporting explanations." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(C)(2).

In this instance, the ALJ failed to properly assess the consistency of Dr. Farrell's and Dr. Snider's opinions. The consistency factor calls for a comparison between the medical opinions and "the evidence from other medical sources and nonmedical sources" in the record. 20 C.F.R. § 416.920c(c)(2). Here, when evaluating the consistency of Dr. Farrell's and Dr. Snider's opinions, the ALJ engaged in no discussion regarding what evidence was consistent or inconsistent with the medical opinions. As such, the ALJ did err as his analysis fails to assess the consistency of the state agency psychologist's opinions with the evidence in the record. However, in this instance such error is harmless. Claimant primarily contends that the ALJ should have adopted Dr. Farrell's and Dr. Snider's assessment that she can relate to supervisors and peers on a superficial work basis. Here, the ALJ determined Claimant could perform the jobs of office helper, routing clerk, and laundry sorter, (Tr. 43), all of which indicate the "people" aspect of the job is "not significant." DICOT §§ 239.567-010, 222.687-022, 361-687-014. The job of office helper (DICOT § 239.567-010) has a "people" rating of 6, requiring speaking and signaling. Additionally, the jobs of routing clerk (DICOT § 222.687-022) and laundry sorter (DICOT § 361.687-014) have a "people" rating of 8, requiring an individual to take

instructions.³ Accordingly, because the jobs identified could be performed by Claimant regardless of whether the ALJ adopted the state agency's more restrictive limitation, the ALJ's failure to properly evaluate the medical opinions of Dr. Farrell and Dr. Snider was harmless. *Lara v. Colvin*, 2014 WL 37746, at *1 (W.D. Okla. Jan. 6, 2024) ("because the ALJ would not have found that Plaintiff is disabled based on her ability to perform the job of unskilled housekeeper even if he *had* included a limitation that she could only relate to supervisor[s] and peers superficially, any error was harmless.") (citations omitted). Regardless, because this case is being remanded for other reasons, on remand the ALJ should engage in a proper analysis of all medical opinions.

*Claimant's Subjective Statements*.  Lastly, Claimant contends that the ALJ erred by failing to properly evaluate her subjective statements. The Commissioner uses a two-step process to evaluate a claimant's subjective statements of pain or other symptoms:

> First, we must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain.  Second . . . we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . .

Soc. Sec. R. 16-3p, 2017 WL 5180304, at *3 (October 25, 2017).⁴ Tenth Circuit precedent is in accord with the Commissioner's regulations but characterizes the evaluation as a

---

³ "Each job listed in the DOT is described by reference to various components. One component is 'Worker Functions.' The worker function labelled 'People' expresses the degree of interaction with other people that the job requires. *Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005); *see also* DOT Appendix B-Explanation of Data, People, and Things, 1991 WL 688701.

⁴ SSR 16-3p is applicable for decisions on or after March 28, 2016, and superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996).  *See* SSR 16-3p, 2017 WL 5180304, at *1.  SSR 16-3p eliminated the use of the term "credibility" to clarify that subjective symptom evaluation is not an examination of [a claimant's] character." *Id.*  at *2.

three-part test. *See e.g., Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1166-67 (10th Cir. 2012) (citing *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987).[5] As part of the symptom analysis, the ALJ should consider the factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), including: (i) daily activities; (ii) the location, duration, frequency, and intensity of pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken; (v) treatment for pain relief aside from medication; (vi) any other measures Claimant uses or has used to relieve pain or other symptoms; and (vii) any other factors concerning functional limitations. *See* Soc. Sec. R. 16-3p, 2017 WL 5180304, at *7-8. An ALJ's symptom evaluation is entitled to deference unless the Court finds that the ALJ misread the medical evidence as a whole. *See Casias,* 933 F.2d at 801. An ALJ's findings regarding a claimant's symptoms "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotations omitted). The ALJ is not required to perform a "formalistic factor-by-factor recitation of the evidence[,]" *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000), but simply "recit[ing] the factors" is insufficient. *See* Soc. Sec. R. 16–3p, 2017 WL 5180304 at *10.

---

[5] Analyses under SSR 16-3p and *Luna* are substantially similar and require the ALJ to consider the degree to which a claimant's subjective symptoms are consistent with the evidence. *See, e. g., Paulek v. Colvin*, 662 Fed. App'x. 588, 593-594 (10th Cir. 2016) (finding SSR 16-3p "comports" with *Luna*) and *Brownrigg v. Berryhill,* 688 Fed. App'x. 542, 545-546 (10th Cir. 2017) (finding the factors to consider in evaluating intensity, persistence, and limiting effects of a claimant's symptoms in 16-3p are similar to those set forth in *Luna*). This Court agrees that Tenth Circuit credibility analysis decisions remain precedential in symptom analyses pursuant to SSR 16-3p.

Here, Claimant primarily contends the ALJ ignored the documented strife between Claimant and her daughter in addition to significant findings of anxiety by Ms. Ward, such as her descriptions of Claimant's panic attacks, Claimant requiring a relaxation disc to be played when discussing her trauma, Claimant's reports that she experienced horrific nightmares, and Claimant's records demonstrating she was irritable and experienced motor agitation, thought-blocking, obsessive thinking, fearful behavior, and disorganized thinking.  In assessing the evidence at step four, however, the ALJ discussed much of the above evidence supporting Claimant's allegations, and the ALJ *did provide* reasons for finding the Claimant's subjective complaints were not believable to the extent alleged, *i.e.*, he gave clear and specific reasons that were specifically linked to the evidence in the record. For example, the ALJ discussed Ms. Ward's therapy records noting that Claimant has a history of abuse, trauma, and tragedies, and acknowledged that Claimant's therapy notes recorded depressed mood, perseverating, blocking, or tangential thought process among other abnormalities. (Tr. 39, n.1). The ALJ also pointed out, however, that Claimant had an intact functional status on many occasions, engaged in therapy techniques, interacted with family and friends, and that Dr. Dansby indicated her anxiety and PTSD were controlled. (Tr. 38, 41). Although the ALJ did not discuss Claimant's relationship problems with her daughter or provide a detailed description of Claimant's panic attacks or the therapy techniques she utilized, he "is not required to recite everything in the evidence; rather, the ALJ must discuss the relevant evidence that demonstrates [Claimant's] ability to work and 'significantly' probative evidence to the contrary." *Smith v. Berryhill*, 2018 WL 1535482, at *9 (N.D. Okla. Mar. 29, 2019) (citing Soc. Sec. R. 96-

8p). Here, it is evident that the ALJ did consider and discuss the evidence which supported Claimant's subjective complaints, and there is no indication that the ALJ misread Claimant's medical evidence taken as a whole, and his evaluation is entitled to deference. *See Casias*, 933 F.2d 801. As such, the ALJ did not err in his analysis of Claimant's subjective statements.

Nonetheless, because the ALJ failed to explain how Claimant's severe impairment of obsessive personality disorder at step two became so insignificant as to require no limitations in his RFC at step four, the decision of the Commissioner is therefore reversed, and the case remanded to the ALJ for further analysis of *all* the evidence in the record. If such analysis results in any change(s) to Claimant's RFC, the ALJ should redetermine what work Claimant can perform, if any, and ultimately whether she is disabled.

## Conclusion

In summary, the Court finds that the decision of the Commissioner is not supported by substantial evidence and the correct legal standards were not applied. Accordingly, the decision of the Commissioner of the Social Security Administration is REVERSED and the case REMANDED for further proceedings.

**DATED** this 27th day of March, 2024.

_____
**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**